### STATE OF MINNESOTA *vs.* ELMER WORTHINGHAM.

#### April 25, 1877.

**Marriage Valid without Formal Ceremony.**—Under Gen. St. c. 61, marriage is a civil contract, of which consent is the essence. A mutual agreement between competent parties, *per verba de presenti,* to take each other for husband and wife, deliberately made and acted upon by living together professedly in that relation, is sufficient, without any formal solemnization or ceremony, to give it validity in law.

**On Issue as to Bastardy, Marriage in Fact need not be Proved.**—Whenever, upon an issue of bastardy, a question arises concerning the existence of a marriage between the parents of the alleged bastard, direct proof of a marriage in fact, as contradistinguished from one inferrible from circumstances, is not required.

**Presumption in Favor of Marriage and Legitimacy.**—The policy of the law favors matrimony and legitimacy rather than concubinage and bastardy, and hence every reasonable presumption should be allowed to support the former, and to defeat the latter.

**Evidence held Sufficient to Prove Marriage.**—On an issue of bastardy, testimony of cohabitation between the parents, as husband and wife, at and prior to the birth of the alleged bastard; that they held themselves out as such in their intercourse with the world; that the woman assumed and went by the family name of defendant; that they had reared a family of children under the same name, and otherwise conducted themselves as married people, is competent evidence for the consideration of the jury upon the question of marriage, and sufficient, if not overcome by a preponderance of evidence to the contrary, to support a finding in favor of a valid marriage so as to protect the children against the stain and taint of bastardy, and subject the parents to the duty of providing for their support.

**Cross-examination to Control General Statement of Witnesses.**—When, on the trial of such an issue, the complaining witness testifies, on her examination in chief, that she was never married to the defendant, it is competent, on cross-examination, to show a course of conduct on her part, and declarations, inconsistent with such her general statement.

**Presumption as to Character of Cohabitation.**—The presumption that a cohabitation, illicit in its inception, remains such in character during its continuance, is one of fact for the jury, and not one of law.

**Oath to Jury in Bastardy Proceedings.**—In a proceeding in bastardy the proper oath to be administered to the petit jury is the form prescribed by Gen. St. c. 72, § 5, for the trial of any civil action or proceeding.

Appeal by defendant from an order of the court of common pleas of Hennepin county, *Young*, J., presiding, refusing a new trial.

*Atwater & Babcock* and *Lowry & Wilson*, for appellant.
*James W. Lawrence*, for respondent.

CORNELL, J. This is a proceeding in bastardy, instituted on the complaint of one Mary Sullivan, which charges that she is, and always has been, an unmarried woman, and that, on February 21, 1875, she gave birth to a bastard child, of which defendant is alleged to be the father. On the trial in the court of common pleas of Hennepin county, upon

a plea of not guilty, the jury found a verdict of guilty, and the case is now before us on exceptions taken by defendant to various rulings during its progress, and to the instructions given to the jury. Neither the alleged paternity of the child, nor defendant's liability for its support, is contested, but the proceeding is resisted because of an alleged marriage between its admitted parents, resulting in the legitimacy of its birth, and in fastening upon the defendant, as its lawful father, the legal duty of providing for its support and maintenance, together with such other duties and obligations in respect thereto as are incidental to that relation. This legal duty defendant claims always to have acknowledged, and professes still to recognize, and to be willing and ready to perform. Under the issue the burden was upon the plaintiff to establish the fact that the alleged bastard was such, by reason of having been born out of lawful wedlock.

The only witness introduced on behalf of the plaintiff was the complaining witness, Mary Sullivan, who testified in chief as follows: "I have lived with the defendant, in Minneapolis, most of the time for the past eight years. We lived together in his house, and I raised children to him under promise of marriage. He promised to marry me. He had intercourse with me the most of the time during that time. I have had five children by him—four now living, and one dead. The youngest was born in February, 1875, and is the one mentioned in the complaint. I was never married to the defendant. The defendant is the father of that child. I lived with the defendant since December, 1868, in the city of Minneapolis. Elmer told me when I first went to living with him that he would marry me as soon as he could procure a divorce from his wife. It was on that condition that we went to living together."

On her cross-examination defendant propounded the following questions and offer of proof, which were ruled out, under objections as immaterial and irrelevant, except

the last, which was excluded on the additional ground of incompetency :

*Question.* " State where you stayed when you first commenced living with the defendant."

*Offer* " to prove by witness that during all the time she lived and cohabited with the defendant, and at the time the child was begotten as charged in the complaint, she held herself out to her friends, neighbors, and the world generally as the wife of the defendant ; that the parties went to St. Paul, and remained one night, and returned to Minneapolis, and then represented to the world that they had been married ; that the complaining witness thereafter assumed and went by the name of Worthingham."

*Question.* " Were your children ever christened, and, if so, what are their names? By what names do they go? I mean both names."

Each of these questions, together with the offer, fell within the legitimate scope and limits of a pertinent cross-examination. She had testified on her direct examination that she had never been married to the defendant, and also to facts tending, if believed, to show that their relations with each other had been criminal in their inception. It was clearly competent, upon cross-examination, to enquire particularly into the origin of their intercourse, and to show a course of conduct on her part inconsistent with the facts to which she had so testified, both for the purpose of discrediting her testimony, and as tending to disprove the truth of her statements. For this error a new trial must be granted, unless it clearly appears, upon an examination of the whole case, from other testimony which is uncontroverted, that no prejudice resulted.

On the defence, the defendant testified " that, at the time he commenced living with the complaining witness, he had not procured a divorce from his former wife," and he thereupon offered to prove a divorce obtained in the district court for Hennepin county, August 5, 1870, some five years prior

to the birth of the alleged bastard. This offer was over-- ruled on the alleged ground that defendant's counsel stated, in answer to an enquiry by the court, that he did not propose to follow it up by proof of a marriage after the divorce.. The implied admission, contained in this testimony and offer, of the existence of a former marriage, was, perhaps, as against defendant, sufficient evidence of that fact to require proof of its dissolution before the reception of any testimony to establish a matrimonial union between him and the prosecuting witness; and the decision of the court in overruling the offer was undoubtedly correct, if the word marriage, as used in the enquiry and answer, was understood by both court and counsel as being so used in its strict legal sense and meaning. Moreover, if it be conceded that the accused had another wife living when his cohabitation with the complaining witness, under a promise of marriage, *per verba de futuro,* began, and that no contract of marriage existed between them, except such as might be implied from that promise alone, it is clear that no substantial prejudice could have resulted to him by reason of any of the alleged erroneous rulings of the court in the rejection of evidence, or in its charge to the jury. But we are satisfied, from an examination of the whole record, and from the points made on the argument, that the use of the word marriage, in the connection above stated, was intended and understood, by both court and counsel, in a restricted sense, as referring solely to a marriage in fact, duly celebrated and solemnized in the manner prescribed by statute. The correctness of this conclusion is apparent from the fact that, immediately upon the rejection of the offer, some evidence was received, and some was offered and excluded, tending to show, by cohabitation and repute, a marriage between the parties by present consent and agreement, made after the alleged divorce, and before the birth of the child, though not formally celebrated by the intervention of any minister or magistrate. Moreover, in its rulings upon defendant's

requests, and its charge to the jury, the court presented the case to them upon the distinct theory that the performance of a marriage ceremony was essential to the legal validity of any marriage between the parties ; and the counsel on the part of the state rests his case here alone upon the correctness of this theory, making no point upon any admission that might be implied from defendant's statement that he did not propose to introduce evidence of any marriage after the divorce. This theory, in our view, is wholly untenable ; and inasmuch as the whole conduct of the trial was governed by it, and as it does not appear what might have been the result had it been conducted upon a correct view of the law applicable to the case, we feel compelled to award a retrial.

By our statute, marriage is declared to be a civil contract, to the validity of which, in law, the consent of parties capable, in law, of contracting, is alone essential. Gen. St. c. 61, § 1. Although containing provisions requiring a license in certain cases, directing how and by whom a marriage may be celebrated, and prescribing other regulations in reference thereto, the statute contains no express clause of nullity, making void a marriage contracted by mutual consent, *per verba de presenti*, unless a prior license is obtained, and a solemnization had, in accordance with its provisions. And the court is not at liberty to give it that effect by construction. 1 Bishop Mar. & Div. (5th ed.) §§ 277, 283, 284, 289. Under statutes of this character, as at common law, it is the established doctrine that no formal solemnization, nor any ceremony whatever, is requisite to give validity to a marriage contract. Consent, freely given, is the essence of the contract. A mutual agreement, therefore, between competent parties, *per verba de presenti*, to take each other for husband and wife, deliberately made, and acted upon by living together professedly in that relation, is held by the great weight of American authority sufficient to constitute a valid marriage with all

its legal incidents. See *Hutchins* v. *Kimmell*, 31 Mich. 126, and cases there cited.

If, therefore, prior to the birth of the child, such a present agreement had been entered into between its parents, at a time when no legal disability rested upon either to make it, and they were cohabiting together as husband and wife in pursuance of that agreement, it constituted a marriage sufficiently valid in law to confer upon their offspring all the rights of legitimacy, though the marriage had never been formally celebrated or solemnized by any ceremony whatever. Assuming, then—what seems to have been a conceded fact at the trial—that defendant had a wife living when he first began cohabiting with the mother of this child under a promise of marriage, and was, therefore, then legally incapacitated from making any matrimonial contract with another, it was nevertheless competent for him to show a removal of the impediment by a divorce lawfully obtained afterwards, and before the birth of his said child, though he might not be able to prove the celebration of his second marriage by the performance of any formal marriage ceremony.

Where the question concerning the existence of an alleged marriage arises upon an issue of legitimacy or bastardy in respect to the offspring, the rule of evidence which requires direct proof of a marriage in fact, as contradistinguished from one inferrible from circumstances, has no application. This rule only applies in criminal prosecutions for bigamy, incest, and adultery, and in civil actions for criminal conversation. The policy of the law favors matrimony and legitimacy rather than concubinage and bastardy, and hence, in every case of a controverted question of this character, concerning which there is conflicting evidence, every reasonable inference is to be allowed to uphold the former, and defeat the latter. As said by Mr. Bishop, " all presumptions of law shall be drawn in to support the marriage, where marriage was the desire of the parties." 1 Bishop Mar. &

Div. § 509. And by reason of these general presumptions, though the intercourse between the parents may have been admittedly wrongful and illicit in its inception, because of some legal impediment to marriage, yet, after its removal, slight circumstances may and ought in a doubtful case to be pressed into the service of showing that the parties have converted what was at first an unlawful into a subsequent lawful union. 1 Bishop Mar. & Div. § 510.

The complaining witness herein testifies to the general legal conclusion that she was never married to the defendant, although she admits having represented herself as his wife, and having cohabited with him as such, after his alleged divorce. She gives no explanation of her meaning in making this statement. It may be that she referred alone to a marital contract formally entered into, and solemnized, through the intervention of some minister or magistrate authorized to celebrate it, in the belief that that was essential to a valid legal marriage ; and that she did not intend to deny the existence of a mutual consent and agreement, made between them after the divorce, *per verba de presenti*, to take each other for husband and wife, and to live and cohabit together ever afterwards in that relation. What her real meaning was, was a question of fact for the jury, to be solved upon a consideration of the whole case, and in view of the presumption that a mother would not willingly bastardize her own children. Her testimony also tends to show — what seems to have been an undisputed fact on the trial — that defendant had a wife living when they first began cohabiting together, and it also shows that their cohabitation commenced under a promise of marriage, to be celebrated as soon as he could procure a divorce from his wife, and, further, that she bore to him five children while they thus continued to live together. Under these circumstances defendant should have been permitted to prove the fact of divorce, as offered, and thereupon to introduce evidence showing that both parties then went to St. Paul,

remained over-night, and thence returning to their residence in Minneapolis represented themselves as having been married, and thenceforth held themselves out to their friends and the world as man and wife, and continued to cohabit together professedly as such; that she then assumed, and ever afterwards went by, his family name; that they christened their children, gave them the name of Worthingham, and treated them as their legitimate offspring, and otherwise conducted themselves in their intercourse with each other, and before the world, as married people. Not only was such evidence competent for the consideration of the jury upon the question of a present mutual consent and agreement of marriage, made after the alleged divorce, but sufficient, if not overcome by a preponderance of evidence to the contrary, to support a finding in favor of a valid marriage, so far, at least, as to invest the issue with the legal rights and claims of legitimacy, and to subject the parents to the duty of providing for their maintenance and support.

This is not a criminal proceeding for the purpose of punishing the defendant, if guilty. Whatever its result, the legal *status* of an innocent child is necessarily involved. To shield it from the disgrace of bastardy, the jury would be fully justified in invoking to its aid every recognized presumption in favor of the legal marriage of its parents, and in holding the latter to all the responsibilities and duties which they may have incurred by professedly assuming that relation.

The point is presented by counsel for the state that no presumption of marriage can arise in this case from any cohabitation of the parties occurring after the defendant's divorce, because of its illicit character in the beginning. An intercourse originally unlawful and lustful from choice undoubtedly raises the presumption that its character remains such during its continuance. But this is a presumption not of law, but of fact, for the consideration of

the jury in connection with the particular facts and circumstances of the case. In the case at bar, it appears that the cohabitation between the parties had its origin, in part at least, in a desire for marriage, and under a promise that such a relation should be assumed as soon as defendant could procure a divorce from his then wife. This indicates that the parties regarded the married state as one preferable to that of concubinage, and weakens somewhat the force of the presumption ordinarily attaching to an original illicit cohabitation. The weight which is to be given to it, however, in this, as in every other case, rests exclusively with the jury, in the exercise of its best judgment, under proper instructions from the court. 1 Bishop Mar. & Div. §§ 507–511.

Gen. St. c. 72, § 5, in prescribing the forms of oaths for use in judicial proceedings, prescribes one "to be administered to petit jurors empanelled for the trial of any civil action or proceeding," and another for like use in the trial of criminal cases. The use of the latter is confined exclusively to the trial of cases wholly and essentially criminal in their nature and character. The former is applicable not only to the trial of civil actions, properly so called, but to all such other actions and special proceedings as, strictly speaking, are neither civil nor criminal actions, and hence cannot properly be classified under either head. The wrong oath was administered to the jury in this case.

Order reversed.