LUCY A. HULETT v. JOHN R. CAREY, Administrator, and Others.[1]

SAME v. SAME.

November 27, 1896.

Nos. 10,080, 10,081—(9, 10).

| 66 | 327 |
| d83 | 209 |
| 66 | 327 |
| e85 | 249 |
| e85 | 250 |
| d85 | 251 |
| d85 | 252 |

Contract of Marriage—Evidence.

The issue being whether the deceased executed an alleged written contract of marriage with the petitioner, conveyances executed by the deceased, subsequent to the marriage contract, in which he was described as a single man, were inadmissible in evidence against the petitioner.

Same—Admission by Conduct.

A letter written by petitioner to her sister subsequent to the execution of the marriage contract, in which she referred to the deceased as "her husband" and "your brother," was handed by her to the deceased to read. He read it, inclosed it in an envelope addressed to the sister, and put it in his pocket with other letters, apparently for the purpose of posting it. *Held*, that this so connected the deceased with the letter that it was competent evidence in favor of the petitioner as his admissions.

Common-Law Marriage—What Constitutes.

It is mutual, present consent, lawfully expressed, which makes marriage. All that is necessary to render competent parties husband and wife is that they agree in the present tense to be such, no time being contemplated to elapse before the assumption of the status. It is not necessary that such a contract be followed by holding themselves out to the public as husband and

[1] Reported in 69 N. W. 31.

wife, or that it be acted on by their professedly living together in that relation. The distinction noted between the fact of marriage and the proof of it.

### Will—Revocation—Marriage of Testator.

The fact that under our statutes a wife may inherit from her husband has not changed the common-law rule that the will of a man is not revoked by his subsequent marriage alone, without the birth of issue.

In the matter of the estate of Nehemiah Hulett, then pending in the probate court for St. Louis county, Lucy A. Hulett, as widow of decedent, presented two petitions: the first praying to have the homestead and certain personal property set off to her; the second praying for vacation of a previous order, admitting to probate a certain instrument as decedent's last will, and that said instrument be declared not to be the last will of decedent. John R. Carey, administrator with the will annexed, and others appeared in opposition to the granting of the petitions, and from judgments dismissing the same petitioner appealed to the district court for said county.

In the district court both petitioner and respondents made motions in each case that certain questions of fact be submitted to the jury, and the court, C. L. Lewis, J., made an order denying said motions, and ordering submission to the jury of the question set forth in the opinion. The case came on for trial before Moer, J., and a jury, which rendered a verdict answering said question in the affirmative; and thereafter the cases were heard, as to the remaining issues, without a jury, before Moer, J., who made findings and ordered judgment in each case in favor of petitioner. From judgments entered in pursuance of said orders, respondents appealed.

Judgments setting off to petitioner the homestead, and giving her an allowance, affirmed.

Judgment setting aside the probate of the will, and adjudging the same to be of no force or effect, reversed.

*J. L. Washburn*, for appellants.

The record does not show a marriage. The method prescribed by G. S. 1894, c. 61, is the only method in this state whereby a marriage can be at once consummated or solemnized. The signing of the contract could have no effect, except to show the consent of the parties and as evidence of their intent. The instrument does not con-

stitute marriage. State v. Worthingham, 23 Minn. 528; Hutchins v. Kimmell, 31 Mich. 126; In re Terry's Estate, 58 Minn. 268, 59 N. W. 1013; Meister v. Moore, 96 U. S. 76; Jewell v. Jewell, 1 How. 219; State v. Bittick, 11 L. R. A. 587, 15 S. W. 325; Grimms' Appeal, 6 L. R. A. 717, 18 Atl. 1061; People v. Loomis, 106 Mich. 250, 64 N. W. 18; Peet v. Peet, 52 Mich. 464, 18 N. W. 220; Hiler v. People, 156 Ill. 511, 41 N. E. 181; Sharon v. Sharon, 79 Cal. 633, 22 Pac. 26, 131; Yardley's Estate, 75 Pa. St. 207; Durand v. Durand, 2 Sweeny, 315; Hinckley v. Ayers, 105 Cal. 357, 38 Pac. 735. There must be a contract in præsenti, followed by habit and reputation of marriage, in order to constitute a good common-law marriage. Hantz v. Sealy, 6 Binney, 405; Odd Fellows' Ben. Assn. v. Carpenter, 17 R. I. 720, 24 Atl. 578; Commonwealth v. Stump, 53 Pa. St. 132; Arnold v. Chesebrough, 7 C. C. A. 508, 58 Fed. 833; State v. Baldwin, 112 U. S. 490, 5 Sup. Ct. 278.

The will was not revoked by marriage. In the absence of statutory changes, marriage alone, without birth of issue, will not revoke the will of a man. A single woman's will was at common law revoked by marriage, because after marriage she had no testamentary capacity; but where her disabilities as to making a will have been removed by statute, it is held that her will is not revoked. The reason of the common-law rule having failed, the rule no longer applies. The reason why at common law subsequent marriage did not revoke a man's will was: first, that the law made provision for the widow which the will could not affect; second, that she could have provided for herself by antenuptial agreement. The statutes of Minnesota have not taken away the widow's provision, so that this common-law rule should fail; but they have increased such provision. 2 Redfield, Wills, 293, 294, 298, 299; 1 Jarman, Wills, 270; 3 Washburn, Real Prop. (4th Ed.) 539; Swan v. Hammond, 138 Mass. 45; Warner v. Beach, 4 Gray, 162; Hoitt v. Hoitt, 63 N. H. 475; Webb v. Jones, 36 N. J. Eq. 163; Roane v. Hollingshead, 17 L. R. A. 592, 25 Atl. 307; Noyes v. Southworth, 55 Mich. 173, 20 N. W. 811; Matter of Burton's Will, 25 N. Y. Supp. 824, 4 Misc. 512; Swan v. Sayles, 165 Mass. 177, 42 N. E. 570; Brush v. Wilkins, 4 Johns. Ch. 506; Will of Ward, 70 Wis. 251, 35 N. W. 731; Graves v. Sheldon (Vt.) 2 Chip. 71; Goodsell's Appeal, 55 Conn. 171, 10 Atl. 557.

*A. M. Pence, Henry S. Mahon,* and *C. K. Davis,* for respondent.

Marriage is a civil contract jure gentium, to the validity of which the consent of the parties is all that is required by natural or public law. No ceremonies are requisite by common law, and if the contract is made per verba de præsenti, though it be not followed even by cohabitation, it amounts, in the absence of all civil regulations to the contrary, to a valid marriage, which the parties cannot dissolve, and which is equally binding as if made in facie ecclesiæ. 2 Greenleaf, Ev. § 460; 2 Kent, Comm. 87; 1 Bishop, Mar. & D. §§ 20, 216–292; 1 Bishop, Mar., D. & Sep. §§ 238, 299, 312–315, 342, 350, 351; Reeves, Dom. Rel. 195 et seq.; Wharton, Confl. Laws, § 152; 2 Hubback, Succession, 276; Swinburne, Espousals, § 4; Fenton v. Reed, 4 Johns. 52; Jackson v. Winne, 7 Wend. 47; McAdam v. Walker, 1 Dow Rep. (H. of L.) 148, 184; Starr v. Peck, 1 Hill, 270; Carmichael v. State, 12 Ohio St. 553; Sharon v. Sharon, 75 Cal. 1, 16 Pac. 345; Port v. Port, 70 Ill. 484; Hebblethwaite v. Hepworth, 98 Ill. 126; Cartwright v. McGown, 121 Ill. 388, 12 N. E. 737; Hutchins v. Kimmell, 31 Mich. 126; State v. Worthingham, 23 Minn. 528; Dalrymple v. Dalrymple, 2 Hagg. Const. R. 54; People v. Loomis, supra.

Neither cohabitation or repute are necessary to make a valid marriage, where the parties have verbally or in writing agreed between themselves to become presently husband and wife. Bissell v. Bissell, 55 Barb. 325; Askew v. Dupree, 30 Ga. 173; Wier v. Still, 31 Iowa, 107; Van Tuyl v. Van Tuyl, 57 Barb. 235; White v. White, 82 Cal. 427, 23 Pac. 276; Mathewson v. Foundry Co., 20 Fed. 281; Boyer v. Dively, 58 Mo. 510; Dyer v. Brannock, 66 Mo. 391, 403; Londonderry v. Chester, 2 N. H. 268, 279; State v. Patterson, 38 Am. Dec. 699; Newbury v. Brunswick, 2 Vt. 151, 159; Durand v. Durand, 2 Sweeney (N. Y.) 315; Hargroves v. Thompson, 31 Miss. 211; Richard v. Brehm, 73 Pa. St. 140; Cheney v. Arnold, 15 N. Y. 345.

Marriage alone is such a change in the condition of a man as revokes his former will. 2 Fonblanque, 353, n. b; Sneed v. Ewing, 5 J. J. Marshall, 492; McCullum v. McKenzie, 26 Iowa, 510; Tyler v. Tyler, 19 Ill. 151; American Board v. Nelson, 72 Ill. 565; Duryea v. Duryea, 85 Ill. 41; McAnnulty v. McAnnulty, 120 Ill. 26, 11 N. E. 397; Crum v. Sawyer, 132 Ill. 443, 24 N. E. 956; Morgan v. Ireland, 1

Idaho, 786; Brown v. Sherrer, 5 Colo. Ct. App. 255, 38 Pac. 427; Young's Appeal, 39 Pa. 115; Swan v. Hammond, 138 Mass. 45.

MITCHELL, J. Nehemiah Hulett, for many years a resident of St. Louis county, and generally supposed and reputed to be a bachelor, died July 25, 1892. Proceedings were duly had in the probate court of that county, whereby a will which he had executed in May, 1862, was proved, and admitted to probate on October 10, 1892, and John R. Carey appointed administrator with the will annexed. On February 13, 1893, the respondent, under the name of Lucy A. Hulett, presented her petition to the probate court, alleging that she was the widow of Hulett, that she was married to him on January 6, 1892, and praying that the homestead of the deceased be set apart to her, and that she be allowed to select certain personal property, pursuant to the statutes in such case made and provided. On September 13, 1893, she presented another petition to the probate court reiterating her marriage to the deceased, and praying that the probate of the will be vacated and set aside and that the will be declared not to be the last will and testament of the deceased. In this petition she alleged that she and the deceased were married by mutual consent, but without any formal solemnization, and that in evidence of such marriage a certain instrument in writing was executed by both parties at the time of the contract of marriage.

Both petitions alleged, and it is admitted, that Hulett died without issue, and that no issue was ever born of the alleged marriage between him and the petitioner. The only ground here material, on which it was asked that the probate of the will be vacated, was that it was revoked by the marriage of Hulett to the petitioner subsequent to its execution. The administrator, the devisees and legatees under the will, and the heirs at law of the deceased all opposed the granting of the petitions; their main contention being that the petitioner had never been married to the deceased. It appeared on the hearings before the probate court that the foundation of the petitioner's claim to be the widow of the deceased was the following instrument, alleged to have been executed by her and the deceased on January 7, but by mistake dated January 6, 1892:

"Contract of marriage between N. Hulett and Mrs. L. A. Pomeroy. Believing a marriage by Contract to be perfectly lawful, We do hereby

agree to be husband and wife and to hereafter live together as such. In witness whereof we have hereunto set our hands the day and year first above written. [Signed]   N. Hulett.   L. A. Pomeroy."

The probate court decided adversely to the petitioner, and denied both her petitions, whereupon she appealed to the district court in both cases.

Inasmuch as the main, if not the only, issue in both appeals was whether there had been a valid common-law marriage between the petitioner and the deceased, both were tried together.   When the appeals came on for trial, the district court ordered that the following question be submitted to a jury, viz.:  "Was the paper purporting to have been made   *   *   *  ' on January 6, 1892 [the marriage contract above set forth], in fact executed by the late Nehemiah Hulett?"  All other issues of law and fact, if any, were reserved to be tried and determined by the court.

Exception is taken by the appellants to the action of the court in submitting this question to a jury.   But upon the record no such objection is open to the appellants, because it appears that this is one of the very questions, but better expressed, which they themselves asked to be thus submitted.   The court, however, had a right to do this on its own motion.   G. S. 1894, § 5361.   This practice is as old as courts of chancery themselves, and this is just the kind of a question which those courts were in the habit of sending out to a court of law to obtain the verdict of a jury.   So far from trying the issues piecemeal, as counsel claim, this question was really decisive of the only issue of fact in the case, as we shall hereafter show.

The case proceeded to the trial before a jury of the question thus submitted to them.   Of course, the contest was over the genuineness of Hulett's signature to the marriage contract.   While evidence was introduced as to various collateral facts tending more or less directly to throw light on this question, the bulk of the evidence consisted of the testimony of experts, properly so called, and of persons acquainted with Hulett's handwriting, as to whether his purported signature to the marriage contract was genuine or a forgery.   As is usual in such cases, the testimony of these witnesses was very conflicting; but the jury answered the question submitted to them in the affirmative, and it is not claimed, and could not be successfully, that the evidence did not justify the verdict.   Hence, unless errors of law,

duly excepted to, occurred during the trial of this issue, it must stand as a settled fact, with all its legal consequences, that Hulett and the respondent did execute the marriage contract on January 7, 1892. This disposes of the first assignment of error.

2. Of the various assignments of error relating to the rulings of the court admitting or excluding evidence on the jury trial only three —the ninth, tenth, and fourteenth—are worthy of special notice.

The appellants offered in evidence a mortgage on real estate executed by Hulett alone on May 31, 1892, in the certificate of acknowledgment of which the notary described Hulett as a single man. This was excluded by the court. Counsel then offered to prove by other documents that Hulett, subsequent to the date of the alleged marriage contract, "continued to make conveyances of property and execute legal instruments in which he was designated as a single and an unmarried man, in the same manner as prior to said date." This offer was likewise excluded. Counsel then offered in evidence a bill of sale executed by Hulett on May 31, 1892, in the certificate of acknowledgment of which the notary described Hulett as a single man. This offer was accompanied by a statement of counsel that this bill of sale was "simply an additional document on the same line." This offer was also excluded.

In view of the specific offers which thus preceded and followed the general offer, we think the latter must be construed as meaning, not that Hulett described himself as a single man in the body of the instrument, but merely that he was so described in the certificate of the officers who took his acknowledgments. But, however that may be, and without considering the competency of such evidence had it been sought to prove a contract of marriage by "habit and repute," we are clearly of opinion that it was inadmissible upon the sole issue then being tried before the jury, to wit, whether Hulett executed the express written contract of marriage referred to. Any statements he might have made in these conveyances were certainly no part of the res gestæ, to wit, the execution of the written contract of marriage. As respects that subject, it seems to us that such evidence would be merely the subsequent self-serving statements of one of the parties.

The fourteenth assignment is that the court erred in admitting in evidence Exhibit 133, being a letter written July 24, 1892, by the respondent to her sister, in Ohio, containing references to her re-

lations to Hulett; as, for example, where she speaks of him as "my husband" and "your brother Hulett."

If Hulett had been in no way connected with this letter, so that it would have been the mere statement of the respondent herself, it would have been inadmissible. But the testimony of the respondent was that she wrote it in the presence of Hulett, and then handed it to him to read; that he read it, put it in an envelope, sealed it, and put it in his pocket. She further testified that she subsequently received it back from her sister, to whom it was written. This letter, according to respondent's testimony, was written the day before Hulett's death. The next morning he left home, to take the cars to go to Duluth, but died suddenly at the station, while waiting for the train. After his death, a number of letters, addressed, and apparently intended to be mailed, were found in his pocket by the undertaker, who gave them to a nephew of the deceased, who put stamps on them, and posted them. As this letter reached the person to whom it was written, the fair inferences from the evidence are that this was one of the letters found in Hulett's pocket after his death, that the envelope in which it was inclosed was addressed, and that these letters were put in his pocket by Hulett for the purpose of posting them when he reached the city. These facts, if true, amounted to such a recognition of and assent to the statements contained in the letter as to make them, in effect, the joint declarations and statements of both Hulett and the respondent, and therefore competent as his admissions.

It is urged very strenuously by counsel for the appellants that the testimony of the respondent, by which she was thus enabled to connect Hulett with the contents of her letter, impinges upon the statute that it shall not be competent for any party to an action, or interested in the event thereof, to give evidence therein of or concerning any conversation with or admission of a deceased person relative to any matter at issue between the parties. G. S. 1894, § 5660. It was held in Chadwick v. Cornish, 26 Minn. 28, 1 N. W. 55, followed in subsequent decisions, that the language of the act refers only to spoken words. If it was a question of first impression, it might admit of discussion whether the statute ought not to be construed in accordance with the views of the late Chief Justice Gilfillan, so as to include any admission of the party, whether by word or act. The peculiar facts of the present case illustrate the fact that admissions by act may often be

as much within the mischief aimed at as admissions by spoken words. But, as the narrower construction placed upon the statute has been adhered to and followed for nearly 18 years, during which the legislature has not seen fit to amend the law, it is now too late for us to reconsider the question.

None of the exceptions to the charge are well taken or of sufficient substance to require discussion. In fact, the charge was, in most respects, a model one. Instead of merely stating general abstract principles of law (as is often the case), which the average lay juror is. usually incapable of correctly applying to the facts of the particular case, the learned judge gave the jury the benefit of a very full, clear, and impartial analysis of the evidence, taking up each important branch of it, and explaining to them its bearing upon the issue which they were to decide. This disposes of all the assignments of error relating to the trial of the issue before the jury.

3. When the other issues came on for trial, by stipulation of the parties all the evidence introduced upon the trial before the jury was deemed as introduced, subject to the same objections and exceptions, in the trial by the court. A small amount of additional evidence having been introduced, both appeals were submitted to the court for its decision. The court thereupon made separate findings of fact and conclusions of law in each appeal. The second finding of fact in each case was to the effect that the deceased and the petitioner were husband and wife, the only difference being that in the one appeal the finding was that they were such on January 7, 1892 (the date of the execution of the marriage contract) and on July 25, 1892 (the date of Hulett's death), while in the other appeal the finding was that they became husband and wife on January 7, 1892; the difference in the two findings being, in our opinion, immaterial. The court held, as conclusions of law, in the one appeal, that the petitioner was entitled, as widow, to an order setting apart to her the homestead of the deceased, etc.; and, in the other, that the will of Hulett, executed in 1862, was revoked by his subsequent marriage to the petitioner. It is to this second finding of fact and to this last conclusion of law that the appellants take exception, and this presents the two principal questions raised by these appeals.

The respondent had been for a long time prior to the execution of the marriage contract in the employment of Hulett as housekeeper

at his farm at Stony Point, some miles out of the city of Duluth.   Her, testimony is that immediately after the execution of this contract she moved into his room, and that from henceforth until his death they occupied the same sleeping apartment and cohabited together as husband and wife.   But she admits that it was agreed between them that their marriage was to be kept secret until they could move into Duluth, and go to housekeeping in a house which Hulett owned in that city.  . While a feeble effort was made to prove that their marital relation had become known to one or two persons, yet we consider the evidence conclusive that their marriage contract was kept secret, that they never publicly assumed marital relations, or held themselves out to the public as husband and wife, but, on the contrary, so conducted themselves as to leave the public under the impression that their former relations of employer and housekeeper remained unchanged.

Upon this state of facts the contention of the appellants is that there was no marriage, notwithstanding the execution by them of the written contract; that, in order to constitute a valid common-law marriage, the contract, although per verba de præsenti, must be followed by habit or reputation of marriage,—that is, as we understand counsel, by the public assumption of marital relations.   We do not so understand the law.

The law views marriage as being merely a civil contract, not differing from any other contract, except that it is not revocable or dissoluble at the will of the parties.   The essence of the contract of marriage is the consent of the parties, as in the case of any other contract; and, whenever there is a present, perfect consent to be husband and wife, the contract of marriage is completed.   The authorities are practically unanimous to this effect.   Marriage is a civil contract jure gentium, to the validity of which the consent of parties able to contract is all that is required by natural or public law.   If the contract is made per verba de præsenti, and remains without cohabitation, or if made per verba de futuro, and be followed by consummation, it amounts to a valid marriage, in the absence of any civil regulations to the contrary.   2 Kent, Comm. 87; 2 Greenl. Ev. § 460; 1 Bishop, Mar. & Div. §§ 218, 227–229.   The maxim of the civil law was "Consensus non concubitus facit matrimonium."   The whole law on the subject is that, to render competent parties husband and wife, they must and need only agree in the present tense to be such, no

time being contemplated to elapse before the assumption of the status. If cohabitation follows, it adds nothing in law, although it may be evidence of marriage. It is mutual, present consent, lawfully expressed, which makes the marriage. 1 Bishop, Mar., Div. & Sep. §§ 239, 313, 315, 317. See, also, the leading case of Dalrymple v. Dalrymple, 2 Hagg. Consist. 54, which is the foundation of much of the law on the subject.

An agreement to keep the marriage secret does not invalidate it, although the fact of secrecy might be evidence that no marriage ever took place. Dalrymple v. Dalrymple, supra. The only cases which we have found in which anything to the contrary was actually decided are Queen v. Millis, 10 Clark & F. 534, and Jewell v. Jewell, 1 How. 219; the court in each case being equally divided. But these cases have never been recognized as the law, either in England or in this country.

Counsel for appellants contend, however, that the law is otherwise in this state; citing State v. Worthingham, 23 Minn. 528, in which this court used the following language: "Consent, freely given, is the essence of the contract. A mutual agreement, therefore, between competent parties, per verba de præsenti, to take each other for husband and wife, deliberately made, and acted upon by living together professedly in that relation, is held by the great weight of American authority sufficient to constitute a valid marriage with all its legal incidents"; citing Hutchins v. Kimmell, 31 Mich. 126. Similar expressions have been sometimes used by other courts, but upon examination it will be found that in none of them was it ever decided that, although the parties mutually agreed per verba de præsenti to take each other for husband and wife, it was necessary, in order to constitute a valid marriage, that this agreement should have been subsequently acted upon by their living together professedly as husband and wife. In some cases, where such expressions were used, the court was merely stating a proven or admitted fact in that particular case, while in others the contract of marriage was sought to be proved by habit and repute, and the courts merely meant that the act of parties in holding themselves out as husband and wife is evidence of a marriage.

In State v. Worthingham, supra, which was a prosecution for bastardy, the defendant offered, as proof of his marriage to the mother

of the child, evidence that during all the time they lived and cohabited together the woman held herself out to her friends generally as his wife, and that both of them represented to the world that they had been married. The point really decided by the court, and evidently the only one it had in mind, was that this was competent evidence of a marriage, and that no formal solemnization or ceremony was necessary to give it validity. The statement in the opinion already quoted is probably subject to the criticism that it does not accurately discriminate between the fact of marriage and the proof of it.

The case of Hutchins v. Kimmell, supra, cited by this court, does contain such expressions as "followed by cohabitation," and "from that time lived together professedly in that relation"; but this language was evidently used simply as a recital of the actual facts in that particular case. There is nothing in the opinion indicating that the court intended to hold that a mutual, present consent to be husband. and wife will not constitute a valid marriage unless followed by cohabitation of the parties and a holding of themselves out as man. and wife.

Sharon v. Sharon, 75 Cal. 1, 16 Pac. 345, and Id., 79 Cal. 633, 22 Pac. 26, 131, is not in point, for the reason that section 55 of the Civil Code of that state provides that "consent alone will not constitute marriage; it must be followed by a solemnization or by a mutual assumption of marital rights, duties, or obligations."

In view of the increasing number of common-law widows laying claim (in many instances, doubtless, fraudulently) to the estates of deceased men of wealth, it is a question for the legislature whether the common law should not be changed; but with that the courts have nothing to do.

4. This brings us to the last and most important question in the case, viz. was the will of Hulett revoked by his marriage to the respondent?

At common law the marriage of a woman absolutely revoked her will. The reason usually given was that, a married woman having no testamentary capacity, her will was no longer ambulatory. But the marriage of a man did not revoke his previous will in regard to either real or personal estate. This was not considered such a change of condition as would work a revocation by implication or inference of law. The reason usually given was that the law made for the wife

a provision, independently of the act of the husband, by means of dower. But the marriage and the birth of issue conjointly revoked a man's will, whether of real or personal estate; these circumstances producing such a total change in the testator's condition as to lead to a presumption that he could not intend a disposition of property, previously made, to continue unchanged. The issue, the birth of which would revoke a will, must have been such as could have inherited the property which was the subject of the will, so that the effect of throwing open the property to the disposition of the law would have been to let in the after-born child or children, for whose benefit alone the implied revocation obtained. The chief reason why marriage and the birth of issue was deemed such a change of condition on part of the testator as would work a revocation of his will was that otherwise his issue, which was the natural object of his bounty, would be wholly unprovided for, differing in that respect from the widow, for whom the law had made provision by means of dower. Hence it seems to have been the rule that marriage and the birth of issue would not produce the revocation of a will, where provision was made by the will itself for the children of the future marriage.

At common law a married woman could not inherit from her husband. In case of her husband dying intestate, she was not entitled to anything out of his estate except her dower. While by our statutes dower eo nomine has been abolished, yet the law makes provision for the widow, independently of the act of the husband, much more liberally than the common law did. She is entitled—first, to a life estate in the homestead of her deceased husband, free from any testamentary devise or other disposition to which she shall not have assented in writing, and free from all debts or claims against his estate; second, to hold in fee simple, or by such inferior tenure as the deceased husband was at any time during coverture seised or possessed thereof, one undivided third of all other lands of which the deceased was at any time during coverture seised or possessed, free from any testamentary or other disposition thereof to which she shall not have assented in writing, but subject, in its just proportion with other real estate, to the payment of such debts of the deceased as are not paid from the personal estate. Of the personal estate of which her husband dies possessed the widow is entitled to all his wearing apparel; his household furniture, not exceeding in value $500; other

personal property, to be selected by her, not exceeding in value $500; a reasonable allowance for her maintenance during administration, which, in case the estate is insolvent, is not to be for more than one year. G. S. 1894, § 4470, 4471, 4477. Such is the provision which the law makes for the widow.

The statute then provides that, where the husband dies intestate, the residue of his estate, real and personal, shall descend and be distributed as follows: first, to his children, and to the lawful issue of any deceased child by right of representation; second, if there be no child, and no lawful issue of any deceased child, then to the surviving wife. It is mainly on this last provision by which the wife may inherit from her husband that counsel for the respondent base their contention that in this state marriage alone will revoke by implication of law the prior will of the husband. Their argument may all be summed up in the proposition that, inasmuch as a widow may now inherit from her husband (which she could not do at common law), therefore marriage alone effects the same change in the condition or circumstances of the husband as was effected under the common law by his marriage and the birth of issue who could inherit. The courts of two or three western states have taken substantially this position. See Tyler v. Tyler, 19 Ill. 151; Morgan v. Ireland, 1 Idaho, 786; Brown v. Scherrer, 5 Colo. App. 255, 38 Pac. 427, approved and affirmed in 21 Colo. 481, 42 Pac. 668.

In Tyler v. Tyler, supra, the question was not discussed at any great length, and the weight of that case as authority is somewhat impaired by the fact that in a subsequent case the court placed its refusal to reconsider the question mainly on the ground that the legislature had subsequently enacted that marriage alone, without the birth of issue, revoked a will, and hence that any decision which the court might make would be merely retroactive.

The most able and forcible presentation of the arguments on that side of the question is to be found in the opinion of the Colorado court of appeals in Brown v. Scherrer, supra. But, after carefully considering all that has been said on that side, we are compelled to the conclusion that due weight has not been given to the fact that the main reason why, at common law, marriage and the birth of issue were deemed such a change in the condition or circumstances of the husband as would work an implied revocation of his prior will was that

otherwise his issue would be wholly unprovided for,—a thing which was not to be supposed to have been in the contemplation of the testator; whereas, under our statutes, and, we assume, without special examination, under the statutes of those states in which the decisions cited were rendered, even if the will stands, very liberal provision has been made for the widow, independently of any act of the husband.

There is a prevailing sentiment, often expressed by both courts and text writers, that marriage alone should be deemed such a change in condition and circumstances as will revoke a prior will. A statute to that effect was passed in England in 1837 (1 Vict. c. 26),[2] followed by the enactment of statutes to the same effect in many of the states of the Union. How far this sentiment may have unconsciously influenced the decisions referred to it is impossible to say; but no court has ever assumed to hold on this ground alone, and in the absence of legislation affecting the question, that the common-law rule was abrogated, or so far modified that marriage alone would revoke a will. It is also suggested that the common-law rule had its origin in part in the ancient desire to build up families and family estates, a consideration which has no place in this country. It is undoubtedly true that many of the doctrines of the common law had their origin in social or political conditions which have in whole or in part ceased to exist. But this fact alone will not usually justify courts in holding that these doctrines, when once thoroughly established, have been abrogated, any more than it would justify them in holding that a statute had been abrogated because the reason for its enactment had ceased. Any such rule would leave the body of the common law very much emasculated; as, for example, that pertaining to real estate.

While, undoubtedly, the common law consists of a body of principles applicable to new instances as they arise, and not of inflexible cast-iron rules, yet where the rules of the common law have become unsuited to changed conditions, political, social, or economic, it is the province of the legislature, and not of the courts, to modify them. While we do not wish to be understood as intimating that no condition of legislation upon the subject of the rights of married women in the estates of their husbands would effect by implication a change of the common-law rule, yet, in view of the main reason upon which

[2] Section 18.

the common-law rule was based,—that marriage alone would not, but that marriage and the birth of issue conjointly would, revoke the prior will of a man,—and in view of the very liberal provision made by statute for the widow independently of the act of her husband, we are of opinion that the mere fact that she may now, under the statute, in certain contingencies, inherit more from her husband is not sufficient to warrant us in holding that the common-law rule has been so changed that marriage alone is such a change of condition or circumstances as will work an implied revocation of the prior will of the husband. We should have stated that our statute relating to the revocation of wills is substantially, if not literally, the same as that of 29 Car. II.,[3] which has been so generally adopted by the American states. G. S. 1894, § 4430.

The conclusion at which we have arrived on this question renders it unnecessary to consider other questions discussed by counsel; for example, as to the power of the probate court to set aside the probate of a will.

In the appeal from the judgment setting aside to the petitioner the homestead of the deceased, and giving her an allowance out of his estate for her maintenance during administration, the judgment is affirmed. In the other appeal, the judgment setting aside the probate of the will, and adjudging such will to be of no force or effect, is reversed.

[3] Chapter 3, § 6.