IN RE ESTATE OF E. R. WELKER.
DORIS HALSTEAD, RESPONDENT.[1]

February 14, 1936.

No. 30,750.

[1]Reported in 265 N. W. 273.

 

*Charles L. Clark* and *George L. Bargen,* for appellant.

*Donald W. McNeil,* for respondent.

STONE, JUSTICE.

Harry Welker, a brother of the deceased, having petitioned the probate court of Hubbard county for an order appointing an administrator, the respondent here, Doris Halstead, filed objections, claiming to have been the common-law wife of the deceased. The resulting issue was tried in the probate court. The decision there was that there had been no marriage between Miss Halstead and Mr. Welker. On the former's appeal to the district court, a jury, to which was submitted the special question, decided otherwise. Harry Welker moved for a new trial and appeals from the order denying that motion.

Mr. Welker at the time of his death was 63 years old. Miss Halstead was then in her twenty-third year. At one time Mr. Welker had operated a summer resort near Akeley. He opened a hotel in that village in August of 1931. Respondent had known him for about ten years and had "kept company" with him some four months before the opening of the hotel. She had been more or less engaged in "house work, store work, restaurant work." When Mr. Welker took over the hotel she became his employe and received wages until the incident next to be related.

December 4, 1931, according to her testimony, respondent with Mr. Welker went by automobile from Akeley to Park Rapids, where a diamond ring costing about $25 was purchased by him and given to her. They returned to Akeley and thereafter, for the 16 months intervening before Mr. Welker's death May 26, 1933, cohabited. But, confessedly, both the alleged marriage and the cohabitation were intentionally kept secret. After the gift of the ring, no more wages were paid respondent. She got from the deceased all the money she needed in odd amounts. He made other gifts to her, "small items" such as stockings, wearing apparel, "pins and beads." He bought her an automobile. That is her testimony, and he did buy

such a car, and she doubtless used it as much if not more than anyone else. It does not appear how the title was registered. He considered it "her car."

In 1932 respondent with the car and some guests made a journey into Canada. She says she had some letters from Mr. Welker. They are not in evidence, and there is no claim that he addressed her as his wife. She continued to be known everywhere under her maiden name. There is no claim on her part that in these letters from her alleged husband she was even saluted as wife. Neither at Akeley nor elsewhere was there suggestion to anyone, by either respondent or Mr. Welker, that their relations had become matrimonial.

Respondent, in spite of her alleged wifely status, continued to address her supposed husband as "Mr. Welker," "Elmer," "Uncle Elmer," "Daddy," "Uncle" or "Unk." She explained that "everybody in town" called him "Uncle Elmer." When Mr. Welker had table guests at the hotel respondent continued, as far as anybody could see, her former work as waitress.

There is no question but that during Mr. Welker's last illness, which was not long, respondent gave him every attention within her power. She was untiring as a nurse. Mr. Welker on his deathbed gave to an acquaintance, one LaMois, the keys of the hotel.

The thing which respondent had to prove in order to sustain her claim was not cohabitation, but the fact of a marriage contract. Cohabitation and other relevant circumstances were competent as evidence, but the conclusion to be sustained was that the contract had been made. There was no direct evidence of it, and the case must therefore go to decision upon the question whether there was enough circumstantial evidence to make an issue of fact and sustain a finding of marriage.

We are not overlooking some testimonial declarations by respondent that a marriage had taken place. In each case she was stopped by counsel or the judge and admonished that she could not say anything about conversations between herself and the deceased. The case went to the jury upon the instruction, not excepted to, that there was no "direct testimony as to any contract of marriage ever

entered into." The question submitted was whether the alleged contract had been "proved by circumstantial evidence." Our omission to state further details is because we find them so slight or equivocal as to be of no consequence. The relations between respondent and deceased during the determinative period were unquestionably intimate. Each had a high regard for and trust in the other. There may have been an intention of future marriage. But that is not the issue. The question now is only as to the alleged marriage, *in praesenti,* at the time of the ring incident in December, 1931.

In this state "marriage, so far as its validity in law is concerned, is a civil contract." 2 Mason Minn. St. 1927, § 8562. The decision in Hulett v. Carey, 66 Minn. 327, 69 N. W. 31, 34, 34 L. R. A. 384, 61 A. S. R. 419, a common-law marriage case, definitely aligned this court with those holding that "it is mutual, present consent, lawfully expressed, which makes marriage." (For cases holding that in addition "habit and repute" are essential to a common-law marriage, see annotation, 33 A. L. R. 27.) Hence, if the contract be proved otherwise, there is no necessity for looking into the habit and repute of the parties thereto. In the Hulett case the contract was in writing. The only issue was whether the alleged husband had signed it. Of course, evidence of habit and repute was admissible for the claimant. Care was taken by Mr. Justice Mitchell in writing the opinion to note the distinction [66 Minn. 338] "between the fact of marriage and the proof of it." In G. N. Ry. Co. v. Johnson (C. C. A.) 254 F. 683, the matrimonial status was held to have resulted from a written contract by mail.

In this case there was no direct proof of the contract. Hence, and necessarily, the effort to establish it was by circumstantial evidence. To that end, evidence of "general repute, or of cohabitation as married persons, or any other circumstantial or presumptive evidence from which the fact may be inferred" was competent. 2 Mason Minn. St. 1927, § 9899. The "admissions," the competence of which as evidence is but confirmed by that section, are those only of "the party against whom the proceeding is instituted."

Upon Miss Halstead was the burden of proof. Her case fails unless she adduced evidence which reasonably supports a finding that there was in fact a marriage contract. We hold that she did not. The whole record must be said, as matter of law, to leave the issue in a palpable lack of balance against her contention. Cohabitation is established, but it was of the secret kind which cannot give rise to an inference of marriage. So far as we know, no case can be found where, there being no other evidence of the contract, habit and repute of the scant and equivocal sort shown here have been held sufficient to sustain judicial affirmation of marriage.

Heminway v. Miller, 87 Minn. 123, 128, 91 N. W. 428, is rather conclusive. There much stronger affirmative evidence was held inadequate to establish marriage. The failure on the part of the alleged wife was that her evidence did not satisfy "the universal holding that the cohabitation must in all respects be matrimonial." In In re Estate of Lust, 186 Minn. 405, 408, 243 N. W. 443, we approved the rule that the cohabitation, where there is nothing else to show marriage, must be "matrimonial in nature, professed and open, such as will create some public recognition that their intentions were matrimonial." That the affirmative evidence here falls far short of that requirement already appears. In Shattuck v. Shattuck, 118 Minn. 60, 136 N. W. 409, the finding of marriage was sustained. But there was evidence which both as to quantity and quality went far beyond anything in this record. It included written admissions by the deceased husband.

The evidence of reputation adduced on behalf of respondent is negligible. There were two witnesses who obviously were testifying almost altogether from their own observations. Neither testified to conversations indicating that anyone other than the witness considered that Mr. Welker had been married to respondent. The reputation necessary to be proved was the general reputation of the parties in the locality. The thing wanted in such a case is the verdict of the community, "the understanding among the neighbors and acquaintances with whom the parties associate in their daily life that they are living together as husband and wife, and not in

452

meretricious intercourse." Note to Grigsby v. Reib in L. R. A. 1915E, at page 39.

Both in her attempts to show matrimonial cohabitation and general repute of marriage respondent fell so far short of laying a sound basis for reasonable inference in her favor that, as matter of law, the negative which prevails in the absence of such proof was not overcome.

The order under review is reversed.