ELLA PHILLIPS DAVIS, Respondent, v. R. W. STOUFFER, Administrator, etc., Appellant.

Kansas City Court of Appeals, June 29, 1908.

1. MARRIAGE: Contract: Witnesses: Law: Society. Marriage in its origin is a contract of natural law and may be entered into without solemnization by a minister, priest or officer where there is no forbidding statute, nor need there be witnesses, since marriage is the parent and not the child of civil society.

2. ———: ———: Consummation: Evidence. Like other contracts marriage may be performed *eo instanti* and that makes it *ipsum matrimonium*. The contracts may be *per verba de futuro* and must be consummated to become 'very marriage.' The contract may be proved as other contracts.

3. ———: ———: ———: Intention. When the marriage agreement is in the present tense with the intention of present performance it requires no further consummation to become "very matrimony" *ipso facto et ipso jure.*

4. ———: ———: ———: Intention. There is a distinction between a contract *per verba de praesenti* for a marriage to be solemnized and *nuptiae per verba de praesenti* without any con-

templation of a future ceremony necessary to complete the relation of man and wife; and though the contract be in the present, yet if the parties mean not then to become husband and wife the matter does not amount to *nuptiae*, for the intention must be that the contract is then and there to produce the status of *consortium vitae*.

5. ———: ———: ———: ———: **Intercourse.** If the contract is *per verba de futuro cum copula* and cohabitation and intercourse follow before solemnization, they are presumed to have been allowed on the faith of the marriage promise, and so allowed that the parties at the time of the copula accept of each other as man and wife.

6. ———: ———: ———: **Evidence: Intercourse.** A contract and the proof thereof are not the same thing, and at common law marriage is complete with the mutual present consent and needs nothing more, such as cohabitation and intercourse, since *consensus non concubitus facit matrimonium*.

7. ———: ———: ———: **Status.** The contract of marriage is distinguishable from marriage itself. The contract makes the marriage and marriage is a civil status arising out of the contract; and a contract of marriage *in praesenti* is itself a marriage producing the status without anything more.

8. ———: ———: ———: **Common Law: English Decisions.** The legal authorities in the United States have ever regarded the above declarations to be the common law of England and the late decision made in the case of Regina v. Millis, 10 Clark & Fin. 543, does not state the common law of England as understood by the courts and legislators of this country when that law was introduced here; and American courts are under no obligation to follow the subsequent mutations of decisions in England.

9. ———: ———: ———: **Wife's Marital Rights.** A wife under a common law marriage when she becomes a widow is entitled to all the property rights accorded a widow married *in facie ecclesiae*, since a marriage good for some purposes and not good for all is a marriage that is not a marriage.

10. ———: ———: ———: **Jus Gentium: Ecclesiastical.** By way of interest Voltaire's view of marriage is noted, to wit: "The natural and civil effects of marriage are independent of religious ceremony, and the church sacrament and the contract are very different things, the one is connected with civil effects, the other with the graces of the church."

11. ———: ———: ———: **Evidence: Reputation.** The evidence relating to a common law marriage is reviewed and the con-

tract between the parties, however informal, is held to have been interpreted by them as meaning to assume the marriage status *in praesenti* notwithstanding certain other evidence that the matter was not so intended and recognized by the husband and the community.

12. ———: ———: ———: ———. Rulings excluding statements made by the husband in regard to his wife are held properly excluded.

Appeal from Saline Circuit Court.—*Hon. Samuel C. Davis,* Judge.

AFFIRMED.

T. H. *Harvey, J. C. Rieger* and *V. V. Huff* for appellant.

(1) The finding and judgment of the court were against the law. There being no sufficient evidence of cohabitation and reputation, such finding and judgment could only be on the theory that a marriage contract, *per verba de praesenti,* without more, was a sufficient common law marriage. This is not the law. Topper v. Perry, 197 Mo. 546 et seq.; State v. Bittick, 103 Mo. 191; Dyer v. Brannock, 66 Mo. 391; State v. Kennedy, 106 S. W. 58; Cargile et al. v. Wood et al., 63 Mo. 513; Reaves v. Reaves, 2 L. R. A. (N. S.), 361; Maryland use of Markley v. Baldwin, 112 U. S. 494. (2) The finding and the judgment of the court were against the evidence. There was no evidence of a marriage contract *per verba de praesenti.* (1) There was no mutual agreement between the parties in the present tense, at the time the marriage was alleged to have occurred. (2) The words used by the parties at the time of the alleged contract were not sufficient to create a contract. (3) There was no promise on the part of the plaintiff to become the wife of the deceased. (4) The evidence of John Phillips, the only pretended witness to the alleged contract, shows that the language used by the deceased at the time of the alleged marriage was nar-

rative and not contractual.    Topper v. Perry, 197 Mo.
546; McKenna v. McKenna, 180 Ill. 577; State v. Coop-
er, 103 Mo. 273; State v. Hansbrough, 181 Mo. 353.  (3)
"When the consent to marry is manifested by words
*de praesenti,* a present assumption of the marriage stat-
us is necessary." Topper v. Perry, 197 Mo. 546; Cart-
wright v. McGown, 121 Ill. 388; State v. Cooper, 103
Mo. 274; Dyer v. Brannock, 66 Mo. 391; Adair v. Mette,
156 Mo. 496; State v. Kennedy, 106 S. W. 57; Mary-
land v. Baldwin, 112 U. S. 494; Reaves v. Reaves, 2 L.
R. A. (N. S.) 353.    (4) To raise the presumption of
a marriage at the common law three essential facts
must concur (1) cohabitation, (2) acknowledgment or
recognition of the marriage relation by the parties, (3)
and the reputation of being man and wife in the commu-
nity.    The cohabitation must be marital and not mere-
tricious (Cargile v. Wood, 63 Mo. 513, et seq.) ; it must
be continuous and not occasional (Imboden v. Trust
Co., 111 Mo. App. 235) ; and must be accompanied by
a recognition of each other as man and wife before the
public, so as to create an undivided reputation of the
marriage of the parties.    26 Cyc., 873, et seq., and cases
cited; Cargile v. Wood, 63 Mo. 513, et seq.; State v.
Hansbrough, 181 Mo. 353; Topper v. Perry, 197 Mo.
548.    (5) The finding of the court was against the
weight of the evidence.    While ordinarily the appel-
late courts will not interfere with the discretion of
the trial court in passing on the evidence, yet where
there is no substantial evidence on which to base its
finding and judgment, the appellate court will set aside
the same.    Flynn v. Wacker, 151 Mo. 545; Meier v.
Proctor & Gamble Co., 81 Mo. App. 410; Kingsbury v.
Joseph, 94 Mo. App. 298.    (6) The court committed
error in excluding competent testimony offered on the
behalf of the defendant.

*Ernest D. Martin* and *Robert M. Reynolds* for respondent.

(1) This is an action at law, and the court below being the trier of the fact, its finding and judgment stands as a verdict of a jury. The appellate court will not interfere unless it can be said as a matter of law, that there is no substantial evidence to support the verdict of the judgment below. Bush v. Brandecker, 123 Mo. App. 470; Martin v. Williams, 96 Mo. App. 249; Baumhoff v. Railroad, 171 Mo. 120; Corlos v. Railroad, 106 Mo. App. 574; Keen v. Keen, 184 Mo. 358. (2) The contention of appellant thus reduces itself to the one question of whether or not there is sufficient evidence in the record to support the judgment as a matter of law. (3) Marriage in this State is a civil contract, by one man and one woman competent to contract, whereby they are mutually bound to each other, so long as they both shall live, for the discharge to each other and to the public of the duties and obligations which by law flow from said contract. R. S. 1899, sec. 4311; Ashford v. Insurance Co., 80 Mo. App. 643; In re Imboden's Estate, 111 Mo. App. 220; Plattner v. Plattner, 116 Mo. App. 405; Dyer v. Brannock, 66 Mo. 391; State v. Bittick, 103 Mo. 183; Adair v. Mettee, 156 Mo. 511. (4) And such contract is not dissolvable at the will of either or both of said parties. State v. Bittick, 103 Mo. 191; Dyer v. Brannock, 66 Mo. 391; Adair v. Mettee, 156 Mo. 511; 1 Bishop on Marriage & Divorce (5 Ed.), arts. 3, 6, 221. (5) But when the contract is executed in what the law regards a valid marriage, its nature as a contract is merged in the higher nature of the status or relation, and the parties thereafter are bound by the law of the new relation, the law of husband and wife. The execution in good faith of the contract for the marriage, is in itself marriage, and an assumption of the marital status and relation. 1 Bishop, Marriage and Divorce (5 Ed.), art. 3; State v. Bittick,

103 Mo. 191; Dyer v. Brannock, 66 Mo. 417; State v. Cooper, 103 Mo. 273; Cargyle v. Wood, 63 Mo. 512; Adair v. Mettee, 156 Mo. 512.    (6) The next question for consideration is how the existence of a marriage may be shown.    Being a contract, it is subject to the same methods of proof as any other contract—by direct evidence, or by proof of facts and circumstances from which its existence may be implied.    Ashford v. Insurance Co., 80 Mo. App. 643; In re Imboden's Estate, 111 Mo. App. 220; Plattner v. Plattner, 116 Mo. App. 405; 1 Bishop, Marriage and Divorce (5 Ed.), art. 594; 26 Cyc. 982; Cargyle v. Wood, 63 Mo. 513; Adair v. Mette, 156 Mo. 512; Imboden Estate, 111 Mo. App. 220; Ashford v. Insurance Co., 80 Mo. App. 643.    (7) Considering then the evidence with reference to the law as stated, is there sufficient evidence to support the judgment.    As no instructions were asked or given in the court below, if there is any theory of the law and evidence upon which it can be done the judgment will be sustained.

ELLISON, J.—Plaintiff, claiming to be the widow of Dr. Joseph B. Davis, deceased, formerly of Saline county, presented a claim to the probate court of that county, where the estate he left was being administered, asking the allowances which the statute gives a widow, including money in lieu of a year's provisions, and $400 as part of personal dower.    [Secs. 106-108, R. S. 1899.]    She prevailed in the probate court and the circuit court, where the case was taken by appeal, and the defendant administrator has brought the case here. The cause was tried before the court, without a jury, and the defense is based on the ground that plaintiff is not the widow of deceased; that they were never married.    There is no pretense of a marriage solemnized by religious ceremony, or under the statute, but a common law marriage is claimed by plaintiff to have been

contracted between her and Dr. Davis. The law bearing upon common law marriages has been ably discussed at length, in oral and printed arguments, by the respective counsel.

That there may be a valid marriage without solemnization by minister, priest, or officer, is not questioned in this country, except where the statute forbids, and it once was so understood in England. [Dyer v. Brannock, 66 Mo. 391.] Marriage is recognized as a status brought about by civil contract and it may be contracted by the parties themselves, as any other contract, without even the presence of witnesses. "Marriage, in its origin, is a contract of natural law; it may exist between two individuals of different sexes, although no third person existed in the world, as happened in the case of the common ancestors of mankind. It is the parent, not the child, of civil society." [Dalrymple v. Dalrymple, 2 Hag. Con. Rep. 54.] To which we may add that the marriage of Adam and Eve was not only without a witness, as noticed in that case, but, so far as the record shows, they married themselves, he repeating the contract and she acquiescing by silence: "And Adam said this is now bone of my bones and flesh of my flesh; she shall be called woman because she was taken out of man." [Genesis, Chap. II, v. 23.]

Like other contracts, it may witness an agreement performed *eo instanti*, that is, the contract of marriage may be a contract which makes a marriage at the time, *ipsum matrimonium*, or, as also expressed in legal terms, a marriage *per verba de praesenti;* or, it may be a contract not intended as a then present marriage, but for a future marriage, or as expressed in legal terms, *per verba de futuro*. And may be proven like other contracts. Imboden v. Trust Co., 111 Mo. App. 220; Plattner v. Plattner, 116 Mo. App. 405. These two forms are illustrated in 1 Bishop on Marriage and Di-

vorce, section 313, by a quotation from Swinburne; thus for a *praesenti* contract, he says: "I *do* take thee to my wife," and she replies: "I *do* take thee to my husband." The contract *in futuro* is: "I *will* take thee,"—thus expressing a future act.    When the latter form is the contract and it is followed thereafter by sexual intercourse (*cum copula*) the marriage becomes complete, as the law presumes in favor of innocence that "they have changed their future into a present consent."

But it is insisted by defendant that when the marriage is a common law marriage, something more than a contract *in praesenti* is needed.    He says that there must be an assumption of the marriage status, and he argues that that assumption means a performance or entering upon the duties of the marriage  relation. Such contention will not bear scrutiny.    It is not supported by any authority.    "When the mutual consent, in the present tense, is between competent parties, they are married."    If intercourse follows it adds nothing in law to the marriage itself, "though it may aid the proof of the marriage."    Mr. Bishop adds (sections 314, 315) that "The mere present consent already described constitutes marriage everywhere, except that by the laws of some countries there must be specified forms superadded, but subsequent copula is not material."    Sir William Scott, after great research, concluded "that the contract *de praesenti* does not require consummation in order to become 'very matrimony,' that it does, *ipso facto, et ipso jure,* constitute the relation of man and wife."    [Dalrymple v. Dalrymple, supra.]    And so the American text-writers state, expressly, that cohabitation, including sexual intercourse, is not necessary to the validity of a contract *per verba de praesenti*. [2 Kent, Com., 86, 87; 2 Greenleaf, Evid., 460; 1 Scribner on Dower, 60; Schouler on Husband and Wife, sec. 31.]    And to the same effect are the American cases. [Dyer v. Brannock, 66 Mo. 403; Topper v. Perry, 197

Mo. 531; Port v. Port, 70 Ill. 484; Carey v. Hulett, 66 Minn. 327; McKenna v. McKenna, 180 Ill. 577; Jackson v. Winne, 7 Wend. 47; Richard v. Brehm, 73 Pa. St. 140; Fenton v. Reed, 4 Johns. 230; Clayton v. Wardell, 4 Comst. 230.] There are cases in which the statement is made that a contract *in praesenti,* followed by cohabitation, or by intercourse, is a valid common law marriage. But the latter clause of that statement was merely addressed to the facts which appeared in the particular case. It was not meant that the marriage would not be complete without that fact. The case of Carey v. Hulett, supra, calls attention to this. So in the case of Dyer v. Brannock, supra, the facts were that the verbal contract of marriage *in praesenti* "was followed by cohabitation as husband and wife." Judge NAPTON stated that the validity of a marriage *in praesenti,* not followed by cohabitation, or, which was not intended to be a present marriage, was not involved. No inference should follow from such remark that he thought cohabitation essential to the contract.

The *contract* of marriage is defined by Judge GANTT in Topper v. Perry, cited above, as being "a civil contract, by which a man and a woman agree to take each other for husband and wife during their joint lives, unless it is annulled by law, and to discharge towards each other the duties imposed by law upon such relation. Each must be capable of assenting and must, in fact, consent, to form this new relation." And the Judge states, in terms, that "if the contract be made *per verba de praesenti* it is sufficient evidence of marriage." He then proceeds to speak of the marriage *status,* or of marriage as a status, and says that "when the consent to marry is manifested by words *de praesenti,* a present assumption of the marriage status is necessary."

What is a present assumption of the marriage status? It is not cohabitation and intercourse, as contended by defendant. It need be no more than a recog-

nition that by the contract the parties, in good faith, have become and are married, for the purpose of assuming and carrying out the marriage relation. There may be contracts in the present tense, yet the parties expect something to supervene before they are married, as that a ceremony shall be performed, or that witnesses will be called in.    In such instances the status of marriage is not then assumed,—there has not been *ipsum matrimonium*. Lord CAMPBELL said in the course of his opinion in Reg. v. Millis, 10 Clark & Fin. 1. c. 749 (a cause we shall discuss further on), that he "relied upon the distinction between a contract *per verba de praesenti* for a marriage to be afterwards solemnized, and *nuptiae per verba de praesenti* without any contemplation of a future ceremony as necessary to complete the relation of man and wife; a distinction (I speak it with the most profound respect) which I think the learned judges have not sufficiently kept in view.    The use of the expression 'contract of marriage' is equivocal, and may mean the actual formation of the relation of husband and wife; but it may mean only an irrevocable engagement to be afterwards carried into effect, the parties not meaning then to become husband and wife, and their engagement therefore, though words in the present tense are used, not amounting to *nuptiae*."    Again he said at page 779, that "I have already attempted to explain that there may be a contract *per verba de praesenti* which is not *ipsum matrimonium*, if the parties consider it executory, and do not mean to live together as man and wife till their marriage shall be subsequently solemnized in the face of the church."

So it is necessary that there should not only be a present contract, but it must be intended that such contract is to then and there produce the status; it must look to the "*consortium vitae;*" and as some contracts, though in the present tense, were not accompan-

ied by such intention, courts have thought it wise and necessary to require the contract to be such as, of itself, established the status. That nothing more was intended by such expression, is seen from the language of decisions and text-writers above cited, repeating upon every occasion that nothing more than the contract was necessary to a perfect marriage at common law, and that it need not be followed by intercourse. We have already quoted from Topper v. Perry. In the authority therein cited we find the same thing stated. Thus in Port v. Port, 70 Ill. 484, it is said "that by the common law, if the contract be made *per verba de praesenti*, it is sufficient evidence of a marriage; or, if it be made *per verba de futuro cum copula*, and *copula* is presumed to have been allowed on the faith of the marriage promise, and that so the parties, at the time of the *copula*, accepted of each other as man and wife." In McKenna v. McKenna, 180 Ill. 577, 54 N. E. 641, and in Cartwright v. McGown, 121 Ill. 388, 12 N. E. 737, there was not a present assumption of the marriage status. In the McKenna case the evidence showed that he came to her room after night and in soliciting to stay with her, stated that "we are as much man and wife now; I take you as man and wife before God and man." She then answered that "if he was to stay in that manner certainly I would let him stay." He then remained and they occupied the same bed. The court held that this was not "equivalent to a promise on her part to become his wife;" that she merely "let him stay," and that that was not a present assumption of the marriage status.

The question was before the Supreme Court of Minnesota in a case very like this and arising in the same way. It was expressly held that when a present contract of marriage in good faith is shown, the status becomes thereby fixed without cohabitation, and proof of reputation of marriage is not necessary. [Carey

v. Hulett, 66 Minn. 327, 69 N. W. 31.]    To this may be added the quotation from Swinburne in Adair v. Mette, 156 Mo. 1. c. 512:    "It is a present and perfect consent, the which alone maketh matrimony without either public solemnization or carnal copulation, for neither is the one, nor the other, the essence of matrimony, but consent only."    If the expression "a present assumption of the marriage status," means that there must not only be a contract *per verba de praesenti,* but that, in addition to an intent to enter, the parties must actually enter upon the relation of husband and wife, all distinction between the two kinds of common law marriages is destroyed.    The executory contract, *per verba de futuro,* requires the relation to be entered into, *cum copula,* before there is a marriage, and if a present marriage requires the same thing, there is no difference between them.

But the defendant administrator insists that it was determined in State v. Kennedy, 207 Mo. 528, 106 S. W. 57, that it is requisite to the validity of a common law marriage that there should be something more than the contract; that reputation and cohabitation were necessary.    The court by no means decided that.    No one could say that reputation of marriage was any part of the marriage for the simple reason that there could not be rightful reputation of marriage until after the marriage; and so cohabitation is not a part of the marriage, for it can only lawfully exist *after* the marriage—as a sequence of the marriage.    In that case both the man and woman testified that they had never been married.    There was evidence only of living together illicitly; not even reputation of man and wife was shown.    Yet it was contended in the Supreme Court that there was evidence tending to show a common law marriage.    In referring to the matter, as thus appearing in the record, the court said that "in

order to *establish"* (italics ours) a common law marriage the parties must not only .be shown to have lived together as these had, but had so lived together as a *sequence* of a marriage made by "a present contract" through words, etc. That was clearly true. While there had been cohabitation in that case, yet the court said it must have been, not illicit, but as a sequence of a marriage *per verba de praesenti.* The fact that the court refers to Topper v. Perry, supra, which we have cited as supporting our position on the general law of the subject, is sufficient to show that the defendant's position is in no way supported by the case. As just remarked, the Supreme Court said that "in order to establish a valid common law marriage," there must be shown, etc. But we will presently show that establishing a marriage is a far different thing from the marriage itself. A contract and proof of a contract are not the same thing. A common law marriage, as we have already repeatedly stated, is complete with the mutual present consent; it needs nothing more. We have already shown by authority of decided cases and such names as Kent, Story, Greenleaf, Scribner and Schouler, that it need not be followed by cohabitation, either in the sense of living together, or of sexual intercourse. Mutual consent, expressed, is the requisite. *"Consensus, non concubitus, facit matrimonium"* (consent, not cohabitation, constitutes marriage) is a maxim of the common law. "Marriage is the cause, cohabitation and repute are the effect." [Yardley's Estate, 75 Pa. St. 207.] And so when the effect is sufficiently shown, the cause, on the presumption of good morals, may be presumed.

Questions of the effect of a contract when admitted, and proof of a contract when disputed, are far different questions. Difficulty of producing evidence which will satisfy those whose duty it is to hear it and pronounce judgment upon it, is beside the question of the contract

itself.    And so it has been said that a contract incapable of proof is for practical purposes no contract, since, if it is not shown by believable evidence, it cannot be known that it exists.    And so if a contract of marriage *per verba de praesenti* is in dispute and it appears that the parties did not actually assume the relation of husband and wife by living together, such fact is, ordinarily, so unreasonable, so out of keeping with natural conduct and, generally, is so inconsistent with the affirmance of such contract as to perhaps destroy, in practical effect, the contract itself by the inference that no intention existed to assume the relation.    But suppose this is explained—suppose it is shown that immediately after the formal contract is made whereby each party intends to be then and there married and to then and there assume the marriage status, one of them is unexpectedly called away and is killed by accident in travel—would any one say that there was no marriage?

Mr. Bishop defines the marriage *status* as distinguishable from the contract.    He says: "Marriage, as distinguished from the agreement to marry and from the act of becoming married, is the civil status of one man and one woman legally united for life, with the rights and duties which, for the establishment of families and the multiplication and education of the species, are, or from time to time may thereafter be, assigned by the law to matrimony."    [1 Bishop on Marriage and Divorce, sec. 11.]

Therefore, in order to a correct understanding of the law governing common law marriages and to avoid confusion in consideration thereof, the distinction between the *contract* which brings into existence the marriage status, and the status itself, must be kept in mind.    [Carey v. Hulett, 66 Minn. 327.]    The contract makes the marriage and the status *is* the marriage.    Hence, it is said that marriage is a status which arises *out* of the contract.    [1 Bishop, Mar. and Div.,

latter part of note to sec. 11.]    When there is a marriage by contract *in praesenti,* its nature as a contract is merged in the status (1 Bishop on Marriage and Divorce, section 14), and when two single persons marry they pass into the status.    [Ib., sec. 37.]    "A contract between two marriageable persons  .  .  .  creates the status of marriage, which is not a contract."   [Ib., sec. 251.]

That a contract of marriage *in praesenti* is itself a marriage, that is, produces the marriage status without anything more, is stated by all commentators on the common law and by all adjudications thereof in this country.   It is as much a marriage as is a formal ceremony performed by an officer or minister.   If a man and woman, intending to be married by the act, have such formal ceremony performed and the man should die the next moment, would not the woman be his widow and, in this country, be entitled to dower and other rights of widows?   There can be no difference in the resulting effect of such formal marriage and that where a man and woman, intending to be married by the act, mutually contract *in praesenti,* he to be her husband and she to be his wife.   She becomes his wife as fully by the latter mode as the former; and, in order to make them man and wife, there is no more necessity for anything further in the one case than the other.   What are the two persons the next moment after they contract that they are husband and wife?   Are they married or single?   If yet single, when do they become married—after what act?   Sexual intercourse?   Is that act essential?   If so, proof of a contract *in praesenti* followed by living together in the same house and the husband providing therefor, but without such intercourse (such instances have happened) would not constitute them husband and wife. Bishop says that "at each particular moment of the existence of persons, they must be either married or single; there

is no intermediate condition." That "to constitute a marriage, the agreement must be in the present time, no moment to intervene between it and the superinducing of the status." That "mutual present consent, lawfully expressed, makes the marriage; what is called consummation adds nothing to its legal effect." [1 Bishop on Mar. and Div., sec. 317.]

And so legal authority in the United States supposed this was the common law of England. But it seems that in 1844 an authoritative announcement was made, in the case of Reg. v. Millis, 10 Clark & Fin. 534, to which we have already referred, that it had never been the common law of England that a marriage could take place, except in a limited degree, without being regularly solemnized according to ecclesiastical law; that is, by certain church formality. It is, indeed, conceded by that case that there may be a marriage, without religious ceremony, by each party contracting *per verba de praesenti,* he to be her husband and she to be his wife, but while such marriage was indissoluble by either or both parties and while it enabled the willing one to proceed against the unwilling party to compel the latter to have the ceremony duly performed, and while a second marriage, though formally solemnized, could be dissolved on account of it, it was not a marriage for most of the material rights of husband and wife and therefore was said not to be "a complete" or "perfect" marriage. It was not complete in that the woman did not take dower on the man's death; the man had no rights in the woman's property; the children were not legitimate; it did not impose upon the woman the disabilities of coverture; it did not make the subsequent marriage of either, while the other was alive, void, but only voidable. [p. 878.] It has been stated that that case was a startling announcement to the bench and bar of this country, as well as to a large proportion of the judges and law-

yers of England and Ireland. The case was a prosecution for bigamy and was appealed from Ireland where the marriage in question, though performed before a minister, he was not one of the established church, and the marriage was, for that reason, declared void and of no effect, and therefore there was no guilt in the second marriage. The consideration of the case, on appeal, was far more thorough than is, or can be, usually given. The judges in the House of Lords were evenly divided, when, according to English rule, the judgment of the lower court was declared to be the law until parliament should enact otherwise. It was afterwards so recognized and followed. [Beamish v. Beamish, 9 H. L. C. 274.] But Reg. v. Millis does not state the common law of England as it was understood to be by the courts and Legislatures of this country when it was introduced here. [Dyer v. Brannock, supra; Hallett v. Collins, 10 How. (U. S.) 174.] It may safely be said that the courts of this country are not under any obligation to follow the mutations of decisions or new views announced in England as to what was the law of that country.

While what we have written as to the completeness of a common law marriage is sufficiently explicit, yet as the effect of such marriage on the rights of the parties, is stated in Reg. v. Millis, to be so far short of a regular marriage by ceremony as, among other things already mentioned, not to carry dower to the widow, we will add, in order to leave no room for misunderstanding, that the widow who has been thus married is entitled to all the property rights accorded a widow who has been married by ceremony. The other rule came into existence by reason of a system of two courts with jurisdiction over the same matter. [1 Scribner on Dower, 105-112.] The temporal courts declared what would constitute a valid marriage, and the ecclesiastical courts, with jurisdiction over the marriage re-

lation and the property rights of the respective parties, and (for reasons, some the very best, some not so good), bent on compelling an observance of church ceremony, declared that while the marriage without ceremony was an indissoluble contract, yet it was not a perfect marriage, and that rights of the one in the property of the other, including dower, did not exist.    The only door of relief for such unfortunate situation,, says Scribner, was through an ecclesiastical court which, at the suit of the willing party would compel the other to submit to a ceremony.    "But in the United States we have no courts of a spiritual character.    With us there is no tribunal furnished with the machinery, or clothed with the power, of compelling the specific performance of a contract to marry.    Hence, if we adopt, without modification, the supposed rule of the common law upon this subject, we are in an infinitely worse condition than the people of England; for while any of our citizens who should undertake to contract a marriage *in praesenti* would be subjected to all the difficulties and embarrassments with which the ecclesiastical courts have environed the irregular marriage in England, in the event that either of the contracting parties should afterwards refuse to solemnize the marriage in a more formal manner, the other, having no forum to which to appeal for the enforcement of a more complete performance, would be neither married nor unmarried."    That author adds that "under our system of laws it is a solecism in language to speak of a marriage as good for some purposes and not good for all—as a marriage which is not a marriage.    And it may be safely said that in those States where the courts already have, or hereafter shall determine in favor of the validity of private marriages, such marriages will be regarded as being attended with all the civil rights and obligations which, under the ecclesiastical law, flow from a mar-

riage duly solemnized *in facie ecclesiae,* and therefore that they confer upon the wife the right to dower."

It is interesting to note Voltaire's view of the subject. He states that "Marriage may exist, with all its natural and civil effects, independently of the religious ceremony." [6 Voltaire's Phil. Dic., 30.] "A long time elapsed before the ministers of religion had anything to do with marriage. In the time of Justinian, the agreement of the parties, in the presence of witnesses, without any ceremonies of the church, legalized marriages among Christians." [Ib., 30.] "Marriage is a contract in the law of nations, of which the church has made a sacrament. But the sacrament and the contract are two very different things; with the one are connected the civil effects; with the other the graces of the church. So when the contract is conformable to the law of nations, it must produce every civil effect. The absence of the sacrament can operate only in the privation of spiritual graces." [4 Voltaire's Phil. Dic., 410.]

So the point for us to determine, and the argument of counsel is directed that way, is what evidence will amount to proof of a common law marriage in this country. We have already stated the law as we understand it, and it only remains to see if the evidence in the case fulfills its requirements.

Both Dr. Davis and Mrs. Phillips were legally capacitated to make the contract charged to have been made. There was evidence tending to show that he desired to become married, of his acquaintance with her and of his frequent visits to her house. Finally he went there, as testified to by her son, "one morning about 9 o'clock; me and my oldest sister was in the room when he came in, we went in the kitchen; him and my mother had a talk there; he called us in the room and they were standing up on the floor and had hold of hands and he said they had come to the conclusion

to live together; they took hold of hands.    He called us in the room, the east room, and they were standing up there, had hold of hands; the Doctor said he had come to the conclusion to live together with my mother as man and wife, and he asked us children what we thought about it and we told him it was all right, and he said at his death he wanted to leave all to her and her heirs."    She said that "it suited her."    There was evidence tending to show that after this he and she lived together and he provided for her.    That afterwards he moved her nearer the business part of the town and that they kept house on the second floor of a building.    Finally a child was born which was named Joseph B. Davis, Jr.    It was further shown that her father and mother came to see them at this latter place when the child was born, and that while there the former expressed concern at the state of their relations. Dr. Davis, according to the testimony of the mother, said that "he had entered into this contract in 1903, her and him, in the presence of the children, and it was all agreed upon.  · 'Now,' he said, 'what do you think about it?'    I said 'Doctor, I am a mighty old woman; I never heard of this common law marriage; it might be so.'    He said, 'I have examined the law; I know what I am doing.'    I said, 'Well, probably you do.' He said, 'Will it be agreable to you?'    I said, 'Yes, sir; if it is the law.' "

She further testified that at another time, afterwards, the doctor said " 'I will make this agreement in the presence of you.    We have agreed if it is agreeable with you to be man and wife under the common law.'    And I said 'That is what I want to hear; I have been in trouble about this thing, and I don't want to have any more trouble about it; if it is law it is law, and I am satisfied.'    In 1905 we lived in the country; I had no chance to see the doctor and meet up with him. In 1905 we moved back to town.    He said at that time

in the presence of the old gentleman, 'I will call your attention to this occasion'—in January, 1905, January 11th, he looked it up and said, 'This is January 11th;' he said—He called her in the room; she was about her work and he called her; he said, 'Ella, your mother has come; come in here; we want to have a conversation over this matter.' He said, 'We want to enter into this contract while your father and mother are here, and we join hands together,' and he says, 'I take her as my wife and we will live together as long as we shall live; I hold her as my wife,' and he says, 'At my death everything I have got I want to go to her and little Joe and my heirs.' She said while standing holding hands, 'I will take and hold him as my husband and everything shall be ours together as long as we live.'" The father's testimony was substantially the same.

If we concede that the evidence of what occurred at what is called the first contract, *standing alone,* was not sufficiently clear and explicit to show a present contract of marriage—yet it is not necessary to say whether what followed in the way of conduct by the contracting parties was sufficient to show that they understood what they said at that time to be a legal contract of marriage and that, in accordance with that idea of its legality, they lived together as man and wife, and therefore, thus supplemented, was sufficient to constitute a marriage at common law. For, however that may be, there was evidence strongly tending to show that acting upon the contract as constituting a marriage, they, after the birth of the child, again formally entered into a contract which showed a marriage with intention to assume the marriage status *in praesenti.* We therefore conclude that there was ample evidence to support the court's finding of a marriage at common law.

In so doing we have in mind the evidence in behalf of the defendant that a marriage was not intended and

was not recognized by Dr. Davis, nor by the community in which they lived.    Such insistence has made necessary the somewhat extended investigation we have given the subject.

We do not regard the rulings in excluding statements made by Dr. Davis in regard to the plaintiff as improper; nor do we see how, if admitted, it would have changed the result.    The judgment must therefore be affirmed.    All concur.