GRACE L. ARNOLD, Appellant, v. JOSEPH L. ARNOLD, Respondent.*

Kansas City Court of Appeals.	January 19, 1925.

1. **DIVORCE: Where Sharp Conflict in Evidence and Same is Not so Overwhelming in Favor of One Party as to Show Decision of Trial Court is Wrong, Appellate Court Should Defer to Trial Court's Finding.** Although in a divorce proceeding it is the duty of appellate court to review the evidence and make a finding for itself, yet when there is a sharp conflict in the evidence, and it does not appear to be so overwhelming in favor of one party as to show that the decision of trial court thereon is wrong, appellate court should defer largely to better opportunities afforded trial court in matter of observing the witnesses upon the stand, their manner and demeanor while testifying.

2. **MARRIAGE: Common-law: The Relationship Created by Contract Purporting to Create Status of Common-law Marriage is Determined by Intention of Parties in Making Contract.** Where written contract is not couched in such terms that its conclusive legal effect is to create the status or relationship of a common-law marriage, the relationship or status created by it is not determined by the name the parties give it, but by the intention the parties had in making the contract as evidence not merely by what they then vaguely said and thereafter affirmatively claimed, but by their subsequent course of conduct thereunder.

3. ———: ———: **Contract Held Not to Create Status or Relationship of Common-law Marriage.** A written contract held not to create common-law marriage where it contemplated at best a temporary relationship of "not less than ten nor more than fifteen years" duration, to be possibly followed by a valid marriage, which parties agreed to keep secret "until such time as it is possible to comply with the law" and parties thereafter conducted themselves, outwardly and to the world at least, as though they were single.

Arnold v. Arnold.

4. ———: A Contract of Marriage to be Valid Must Bind Parties Thereto for Full Term of Their Natural Lives. Nothing short of a contract by which parties shall be bound for full term of their natural lives can constitute a valid marriage.

5. ———: Where Establishment of Marriage Depends upon Evidence from Which Marriage is to be Inferred from Circumstances, a Holding Out and Living Together as Man and Wife is Necessary. Where there is no written contract and no such direct, clear and positive evidence of a present contract of marriage, but establishment thereof depends upon evidence aided by that from which marriage is to be inferred from circumstances, then a holding out by parties as man and wife and living together as such to an extent and in a manner as will ·produce the reputation that they are married is necessary.

6. ———: Where Parties Hold Themselves Out as Man and Wife and Live Together as Such to an Extent as Will Produce Reputation They are Married, a Contract of Marriage May be Inferred. Where parties hold themselves out as man and wife and live together as such to an extent and in a manner as will produce the reputation that they are married, a contract of marriage may be inferred.

7. ———: While Cohabitation and Behavior as Man and Wife May Afford Inference of Marriage, Such Inference May be Rebutted. While cohabitation and behavior, as husband and wife, may afford an inference of marriage, yet such an inference may be rebutted.

8. ———: Court Could Accept or Reject Plaintiff's Explanation of Evidence That She Realized She Was Not Married. Where plaintiff relied upon an alleged contract of common-law marriage with defendant, her explanation of letters and urgings showing that she realized they were not married and hence she desired they should be, was for court to accept or reject as it might deem itself compelled to under the evidence.

9. ———: Sporatic Recognitions of Plaintiff by Defendant as His Wife Insufficient to Conclusively Fix Marriage Status. Evidence of plaintiff as to four sporadic, furtive, incidental recognitions of plaintiff by defendant as his wife cannot be accepted as conclusively fixing the marriage status and aiding the contract to that extent.

---

*Corpus Juris-Cyc. References; Divorce, 19CJ, p. 193, n. 30, 32; Marriage, 38CJ, p. 1317, n. 21; ·p. 1318, n. 22, 25, 28, 29, 30, 35; p. 1322, n. 57; p. 1336, n. 41; p. 1339, n. 60; p. 1345, n. 1.

Appeal from the Circuit Court of Jackson County.—*Hon. Willard P. Hall,* Judge.

AFFIRMED.

*E. S. Bennett, Llewellyn Jones* and *L. T. Dryden* for appellant.

*W. H. Carr* and *E. C. Hamilton* for respondent.

TRIMBLE, P. J.—This is an action for divorce, with a prayer for alimony. The defense was that no marriage was ever contracted between plaintiff and defendant. The court, after hearing the evidence on both sides, overruled defendant's demurrer to the evidence; and, after consideration of all the evidence in the case, dismissed plaintiff's petition. No findings of fact or conclusions of law were asked or given. The plaintiff appealed.

The evidence discloses that plaintiff, in 1916, was a widow by the name of Grace L. Clark with three children aged eleven, seven and five, living in Lees Summit, Missouri, in rooms over defendant's store, which rooms she rented from the defendant; that afterwards she operated these, or others belonging to defendant, as a rooming-house and worked for him as a clerk in his store, which was a new and second-hand furniture establishment. For her services as clerk he paid her $5 per week and she paid him rent for the rooming-house.

Plaintiff claims that on September 7, 1916, she and defendant executed a written contract, which is as follows:

"On this 7th day of Sept. 1916 we, Joseph Lee Arnold and Mrs. Grace Luanna Clark both of legal age, do enter into a Common Law Marriage contract.

"We both do agree to and solomly promise each other to live true to our vows to each other for a period of not less than ten nor more than fifteen years from this date.

"At the end of the ten or fifteen years which ever may seem best to us we agree to enter into legal marriage thus making anew before men the vows already made at this time before God, on whom we call to witness and bless our Union, praying him to forgive our sin in view of our great love for each other, and the obsticles in the way of legal marriage at this time.

"We also each promise to keep this common law marriage secret until such time as it is possible to comply with the law. Each agreeing that if they shall be the one to make this known to the public, that the other is thus released from his or her vows and the other shall be free. And from this day until one or the other breaks his or her promise of secrecy or until we are legaly joined by the civil law as well as by the law of God which we promise to hold sacred we are man and wife what God has joined together let no man put asunder.

"Signed)

J. L. ARNOLD
GRACE LUANNA CLARK.
J. L. ARNOLD
GRACE LUANNA CLARK."

Plaintiff testified that they had no contract in relation to marriage other than the written one, and that their verbal agreement prior to its being expressed in writing was the same as the written contract.

Her evidence is that they entered into this arrangement without any witnesses and kept it secret because "it wasn't desirable on account of the children to make my marriage public;" that after this contract was made they lived together as husband and wife, she doing the cooking and buying the groceries (for which he paid), keeping house for him, and he sleeping with her. It is manifest, however, from her own testimony that they did not live openly as husband and wife, for she says it was kept a secret which she did not divulge until he began paying attention to another woman whom he later married, whereupon she brought this suit for divorce.

She further testified that he never introduced her as his wife, but that on four different occasions, he told different individuals in her presence that she was his wife. One time was when Mrs. Chapman (plaintiff's cousin) was with plaintiff and defendant in an automobile, on Mrs. Chapman's way from Lees Summit where she had been visiting, to the Union Station in Kansas City, whence she would return by rail to her home in Oklahoma; that during this ride Mrs. Chapman invited or requested him to bring plaintiff down to visit her after they were married, and defendant replied, "we're already married." Another time was when the eldest daughter came unexpectedly at night into her room and, finding defendant in bed with her mother, began immediately to expostulate with them, whereupon he said to the daughter that "it is alright your mother is my wife." Another time, in plaintiff's presence, he said to Mrs. Irvin, in recalling his identity to her, "Don't you remember my wife and I stopped and bought a tire from you when we went to the fair?" Plaintiff also says that he stated to her son Henry that she was his wife, but the circumstances are not given, and the son did not testify. Plaintiff was corroborated by the other three persons named. Mrs. Irvin testified that on one occasion defendant asked her "Where did Grace stay last night?" and when witness questioned what business that was of his, he replied: "It is my business because she is my wife."

Plaintiff testified that their relations continued five years and four months; that during that time she went by the name of "Grace L. Clark" though frequently people addressed her as Mrs. Arnold. She admitted that as late as May 11, 1922, she published a notice in the Lees Summit paper which she signed "Grace L. Clark," in which she stated "there are people in Lees Summit who believe that the rooming-house where I have lived with my family . . . belongs to Mr. J. L. Arnold, and that I am only acting as housekeeper for him. This is an error that I wish to correct."

It seems from her testimony that she became pregnant, and as there was talk about town that she was living immorally with him, and he, so she says, was insisting that she release him so he could marry another woman, she on February 16, 1922, wrote him referring to a proposition she had made to him whereby if he would "wait one year required by law until I could give you back the freedom" she would release every property right she had on him, and then when the year was up he could start afresh and honorably win the hand of the woman he desired to marry, but that it would be only a matter of a few weeks until people could readily see her condition and hence the time had come for her to act. Apparently the proposition, judging from her evidence, was that he marry her so as to give his name to the child and then she would divorce him without alimony, thereby saving the situation as to herself and the child. Anyway, the letter continues—

"I won't expect any favor what ever from you I am giving you this last chance to save not *me* but *yourself*. For I am not going to bear this thing alone, I have fought down my love for you until I am able to overcome it to the extent that if I don't put myself before you, I can at least put myself on an equality with you. I shall wait until Sunday, and if I don't hear from you by then, next week I will go to the bank and change my acct. to the name of Mrs. Grace L. Arnold. And from then on that name will go on every check, and everywhere else that I have need to sign it. And I will take that name and wear it publicly.

"If you go to law about it or make any trouble about it, then I will have no choice but it, give the facts to the public. I don't want to do this I would save you if I could. But why should I sacrifice myself to save you. When you could save us all three, without any harm or cost to yourself, and you won't do it. Now Joe this isn't a threat. It is just a plain statement of facts. And it rests entirely with you.

"If you are willing to do right by me we can go to Warrensburg Sunday afternoon stay all night with Cora, get our business fixed up Monday morning as soon as the courthouse opens. I don't call it getting married for it would be only a business contract. When we get back to Les Summit, you need not see me again, even to get your rent for I can pay that at the bank. And you can put a notice in the Lees Summit Journal that you won't be responsible for any of my debts past, present or future.

"Now, Joe, do just as you please about this, but you know that I will do just as I say I will. It isn't that I want you or that I want to force you against your will into a marriage with me. But I am bound and determined not to bear the consiquence of our son all alone. And your child if it is a boy will be named Joseph Lee Arnold.

"And if you come out and expose me you must at the same time expose yourself so you must either keep still and let people think I am your wife or go to law to prove I am not and give the whole story to the world at large, and take what comes from the people after that."

She says that she was already then his wife under the common-law marriage, but she was afraid people wouldn't believe it and she had been informed both by him and his lawyer (though at the time she did not know the latter was his lawyer) that she could not prove such marriage; and it was for this reason she wrote the letter; she wanted him to marry her by a civil ceremony and thus conclude the matter.

Plaintiff admitted that on January 30, 1922, she signed the following agreement:

"Lees Summit, Mo.
"January 30, 1922.

"Contract of Agreement.

"Mrs. Grace L. Clark first party and J. L. Arnold second party. First party agrees that second party has fulfilled all agreements with first party. And will not cause any trouble and way shape are form and will not enter fear with second partys business any ways. And will not cause any trouble with whom he may choose to

go with are marry and there will be no harsh feelings and will be friends.

"(Signed) MRS. GRACE L. CLARK."

Plaintiff says, however, that she was compelled to sign it because defendant threatened to put her out of the house in the dead of winter, and she signed it in order to be allowed to stay.

Defendant denied ever signing the instrument plaintiff claims is a contract of common-law marriage, and says he never saw it before and that the signature thereto is not his. He admitted having sexual relations with plaintiff but denied there was ever any agreement as to marriage of any kind or that he had ever recognized her as his wife. He offered evidence tending to prove that his reputation for truth was good.

The trial court found for defendant without disclosing whether the conclusion reached was based upon a finding that the alleged contract was not signed by defendant, and although the original contract together with genuine signatures of the defendant for comparison are on file with the court, yet there is, to our minds, not enough dissimilarity between the genuine signatures and the one in question for us to say that the latter is a forgery. Although, in a divorce proceeding, it is our duty to review the evidence and make a finding for ourselves, yet when there is a sharp conflict in the evidence, and it does not appear to be so overwhelmingly in favor of one party as to show that the decision of the trial court thereon is wrong, we should defer largely to the better opportunities afforded it in the matter of observing the witnesses upon the stand, their manner and demeanor while testifying. [Randazzo v. Randazzo, 236 S. W. 1061, 1063; Methudy v. Methudy, 238 S. W. 562, 567; Alt v. Alt, 249 S. W. 153, 154.] On this theory we might well decline to interfere with the trial court's finding and affirm the judgment. But there is a view of the trial court's course which may indicate that the signature to the contract was considered genuine, but that, even so, the proof offered in support of a common-law marriage

is not sufficient to establish such marriage. And we will therefore consider the case on that question.

We entertain the view that even though the signature to the alleged contract be genuine, yet it fails to establish a valid common-law marriage, especially when taken, as it must be, in connection with the conceded facts of the case. Certainly, at least, we cannot find substantial grounds to differ with the learned chancellor as to his interpretation of that contract in the light of the conduct of the parties with reference thereto.

The written contract is not couched in such terms that its *conclusive* legal effect is to create the status or relationship of a common-law marriage. Such being the case, the relationship or status created by it is not determined by the *name* the parties give it, but by the *intention* the parties had in making the contract as evidenced not merely by what they then vaguely said and now affirmatively claim, but by their subsequent course of conduct thereunder. That the contract is susceptible of an interpretation other than that of a contract of common-law marriage is shown by the fact that it contemplated at best a *temporary* relationship of "not less than ten nor more than fifteen years" duration, to be *possibly* followed by a valid marriage. Furthermore, this temporary and preliminary relationship is not that of *marriage* under the common law, but an agreement to live together illicitly until such time as obstacles might be removed and a marriage consummated, else why pray God "to forgive our sin in view of our great love for each other, and the obsticles in the way of legal marriage at this time." And why promise to keep such relationship *secret* "until such time as it is possible to comply with the law?" It would seem that nothing short of a contract by which each shall be bound for the full term of their natural lives can constitute a valid marriage. State v. Bittick, 103 Mo. 183, 191, where it is said:

"Marriage is the civil status of one man and one woman, capable of contracting, united by contract and mutual consent for life, for the discharge, to each other

and to the community, of the duties legally incumbent on those whose association is founded on the distinction of sex."

Again, the relationship was to be kept *secret*. We need not say whether, in order to constitute a common-law marriage, there must be, in addition to a *written contract* or agreement of such marriage, a *holding* out to the public of such relation and a recognized reputation that it exists. In a case where *oral* evidence clearly showed a *present* contract of marriage in good faith, this court, in an opinion by ELLISON, J., held that the status became fixed without cohabitation, and proof of reputation of marriage was not necessary. [Davis v. Stouffer, Admr., 132 Mo. App. 555, 565, 566.] Of course, where there is no written contract and no such direct, clear and positive evidence of such present contract of marriage, but the establishment of the marriage depends upon evidence aided by that from which marriage is to be *inferred* from circumstances, then doubtless a holding of themselves out by the parties as man and wife and a living together as such to an extent and in the manner as will produce the reputation that they are married, is necessary. Under such circumstances a contract of marriage may be inferred. [Cargile v. Wood, 63 Mo. 501.] But while cohabitation and behavior, as husband and wife, may afford an inference of marriage, yet such an inference may be rebutted. [Port v. Port, 70 Ill. 484.] In a case where the evidence of a present contract of marriage was *oral* and did not afford "strong proof" that a marriage was consummated, the court held that "to establish such marriage there must be not only reputation and cohabitation as a sequence thereto" but that there was a contract or agreement that each took the other as a spouse. [Randazzo v. Randazzo, 236 S. W. 1061, 1063.] A similar ruling under similar circumstances was made in Bishop v. Brittain Investment Company, 229 Mo. 699. But even if a holding out and reputation are not necessary in a case where there is a *written* contract, still the contract in this case is not to be *con-*

*clusively* interpreted as a present contract of common-law marriage, in view of its terms and in the light of what the parties did. Their relationship was to be kept *secret* and the parties conducted themselves, outwardly and to the world at least, as though they were single. Indeed, plaintiff's letters and urgings show that she realized they were not married and hence she desired they should be. Of course, she seeks to *explain* this, but certainly her explanation is for the court to accept or reject, as it may deem itself compelled to under all the evidence. Consequently, we cannot disagree with the conclusion reached by the learned chancellor, on the theory that the written contract, being genuine, conclusively fixes the status of the parties. Nor can we say that the evidence in plaintiff's behalf as to the four ''sporadic, furtive, incidental'' recognitions of plaintiff by defendant as his wife, must be accepted as conclusively fixing the marriage status, and aiding the contract to that extent. See Bishop v. Brittain Investment Co., 229 Mo., 699, 730, where it is held that such furtive, sporadic or incidental recognition is not sufficient. And at page 731, the court says: ''The generalities that the law presumes morality, not immorality; marriage, not concubinage; legitimacy, not bastardy, are maxims applicable to cases where the proof of marriage is of such character as to warrant the presumption. To our minds the facts of this case were not that way.'' And the same can be said of the case at bar.

We are not unmindful of the forlorn and pitiable condition in which the plaintiff is left. Nor is the conduct of the defendant to be condoned or glossed over; but courts cannot change conditions brought about by the parties' own weakness, ignorance or failure to observe the ordinary precepts of caution. There is only one safe way for a woman to deal with a man—that is the conventional and lawful way; all others inevitably lead to disaster and suffering.

The judgment is affirmed. The other judges concur.